CHARLES S. MARTIN, Appellant, *v.* WILLIAM C. PEYTON and Others, Respondents, Impleaded with OSCAR L. GUBELMAN and Others, Defendants.

First Department, February 4, 1927.

Partnership — relationship — action to hold certain persons as partners in banking business — loans of active securities were made to firm while in financial difficulties — defendants had no direct connection with said firm — compensation for said loans was fixed at percentage of net profits with minimum limit — firm transferred certain inactive securities to trustees — members of firm transferred their interest in business, and other security was given for return of active securities — said agreement, for protective purposes, regulated conduct of business — no partnership relation shown.

In an action to hold certain defendants liable, as members of a defunct partnership, engaged in the banking business, the evidence introduced was insufficient to establish the relationship, since it appears that at a time when the firm was in financial difficulties, the alleged partners were approached by a member of the firm to furnish financial assistance; that assistance was eventually furnished by the alleged partners under an agreement whereby they loaned to the firm certain active securities and were to receive in payment for the loan a percentage of the profits with a minimum limit in amount; that the firm, as security for the return of the active securities, transferred certain inactive securities to trustees representing the alleged partners, and each member of the firm transferred his interest in the business, and the firm furnished other security for the return of said active securities; and that the alleged partners, by the agreement, were given a certain restrictive control over the activities of the firm as a further security for the return of the active securities loaned to the firm. The agreement also specifically states that it was not the intention of the parties that the alleged partners should be considered members of the firm or that they should be under any liability for firm obligations.  ·

APPEAL by the plaintiff, Charles S. Martin, from a judgment of the Supreme Court in favor of the respondents, entered in the office of the clerk of the county of New York on the 6th day of March, 1925, upon the report of a referee appointed to hear and determine the whole issues.

The plaintiff does not appeal from that part of the judgment which dismisses the complaint upon the merits as to the defendants who are not respondents.

*Charles P. Howland* of counsel [*John D. Van Cott* with him on the brief; *Rushmore, Bisbee & Stern*, attorneys], for the appellant.

*Alfred R. Page* of counsel [*Leonard B. Smith* with him on the brief; *George W. Elkins*, attorney], for the respondents William C. Peyton and another.

*Lewis L. Delafield* of counsel [*Alfred Gregory* with him on the brief; *Hawkins, Delafield & Longfellow*, attorneys], for the respondents Evelina B. Perkins and others.

MARTIN, J. The plaintiff appeals from a judgment in favor of certain defendants who the complaint alleges were partners in the bankrupt firm of Knauth, Nachod & Kuhne and liable as such to creditors. The referee held that they were not partners.

The defendants Oscar L. Gubelman, James F. Shaw, Rollin C. Newton, Herbert B. Smithers, John R. Hall, Mary W. Knauth and Theodore W. Knauth, who have been called the " avowed partners," were concededly partners in the firm of Knauth, Nachod & Kuhne for some time prior to June 4, 1921, and down to and including June 15, 1923, the date when the petition in bankruptcy was filed. For convenience, these " avowed partners " are referred to as constituting the firm. The other defendants are referred to herein as members of either the Peyton group or the Perkins group. They were respectively connected or acquainted with William C. Peyton or George W. Perkins, Jr., who were separately approached by John R. Hall with the result that eventually agreements were entered into upon which plaintiff relies to hold all of them as partners.

It is not asserted that they are liable as partners by estoppel, it having been expressly stipulated that they had not held themselves out as partners.

The firm of Knauth, Nachod & Kuhne was engaged in the business of private bankers and commission merchants in New York city and had been in existence under the same name for about seventy years prior to June 4, 1921, with an office during the latter part of such period at No. 120 Broadway, New York city. It had an extensive foreign banking business and numerous banking connections, and its bills were accepted throughout the world. A staff of about 300 were employed, about half of whom were in the foreign exchange department, and its total annual transactions in 1920 and 1921 are said to have exceeded $100,000,000 each year.

In January, 1921, the firm being in need of financial assistance, John R. Hall, who had been a member since January 1, 1920, and who had previously had close business and personal relations with

William C. Peyton, obtained from him a loan of $488,000 in Liberty bonds for three months, for which accommodation the firm paid William C. Peyton $2,500. Subsequently the partnership found itself not only unable to repay this loan, but in need of further liquid resources of about $2,000,000 for use as capital in the business.

John R. Hall carried on negotiations with the members of the Peyton and Perkins groups with a view to obtaining these resources for the firm. He had been a personal friend of William C. Peyton for a number of years and testified at length with reference to his social and business obligations to Peyton, and the gratitude he felt toward him. He had been indebted to Peyton in a substantial sum of money since 1913 and had been nominated by him as a director or officer in a number of corporations. John R. Hall was personally acquainted with the Perkins family and with Edward R. Freeman, one of the Perkins group.

Three of the defendants who deny that they were partners are women, who had never met any of the firm of Knauth, Nachod & Kuhne other than John R. Hall before said negotiations were commenced.

Through John R. Hall's influence it was arranged that the two groups should supply the resources necessary for the firm's continuance. He conducted most of the negotiations with them. Oscar L. Gubelman and the other partners took part in the negotiations but rarely, though to some extent they kept informed as to same. William C. Peyton's attorney and business associate was charged with the preparation of the agreements.

It appears that William C. Peyton and Edward W. Freeman had been informed that the firm had net book profits of at least $2,000,000 in the year 1919, and that annual earnings for five or ten years preceding 1919 had been at least $300,000. The further advances to the firm were made in the belief that with the additional resources it would again make profits, and on the judgment of John R. Hall that the foreign exchange department, which was the chief branch of the business, with proper financing and operation could be made to earn profits of at least $1,000,000 a year.

It was finally decided that the Peyton and Perkins groups should furnish $2,000,000 for the firm's needs and receive forty per cent of the profits. The firm's net capital worth at the time was estimated at $700,000.

Having been informed by counsel that under the Usury Law the interest or compensation that could be received on a cash loan was limited, whereas on a loan of personal property there was no limit to the compensation which could be lawfully contracted for,

William C. Peyton and Edward W. Freeman, or counsel on their behalf, proposed that the transaction take the form of a loan of securities, with a right in the firm to hypothecate those securities, with the appointment of trustees to represent the so-called lenders, and with a percentage of profits to them as compensation for the services of the trustees and for the loan of the securities advanced.

It appears that the firm had securities described as " slow " or inactive, such as could not be readily used to raise money at lending institutions. They constituted substantially the only collateral security which could be given to the Peyton and Perkins groups for the desired supply of working capital. John R. Hall had told William C. Peyton that the firm's problem was to liquefy certain slow assets and to obtain thereby the working capital as banks would not advance upon what it had to pledge.

The agreements made were dictated by the Peyton and Perkins interests, who evidently had a free hand to make the loan on whatever terms they saw fit to impose.

It was agreed to loan the active securities having a current market value on June 4, 1921, of about $2,400,000, title to the same to remain in the owners and the loan not to be considered a loan of any sum of money, although the firm was allowed to hypothecate the securities for not exceeding $2,000,000 on notice to Edward W. Freeman and William C. Peyton, who are called the trustees, the particulars of each loan to be given to them. The Peyton and Perkins owners were given the right to withdraw securities to the amount of any increase in current market value over the $2,000,000 and, on the other hand, if the current market value should decline the owners agreed to deposit further securities to make up the deficit. It was also provided that the trustees should have a right to substitute other securities of equal value and equally available as collateral. All income, interest and dividends on these active securities were to be credited to the trustees and be subject to their order, and the firm was required to make a statement thereof each month as well as to return the identical securities to their owners on or before April 15, 1923, unless the agreement should be extended.

As a guaranty of performance for such return the firm agreed to assign and deliver to the trustees the inactive securities referred to above, comprising everything the firm had available for such purpose there being provisions for the resale or rehypothecation of the same. It was also agreed to deposit further securities and to substitute better ones, if available, or cash.

The agreement stated it to be the intention that the firm would return the active securities at the earliest date it might be prac-

ticable to do so without injuring its business, and to make available from profits or other sources funds to be used for the redemption of the active securities. Income on the inactive securities held by the trustees in pledge was to be retained as further security or used for the redemption of those loaned and hypothecated.

The firm agreed to insure the life of John R. Hall for the sum of $1,000,000 and to continue that insurance so long as there should be in the hands of the firm any of the securities loaned to it, the policies to be payable to the trustees as further security for the return of the active securities.

The directing management of the firm was to be in the hands of John R. Hall until the return of all of the active securities, under penalty of immediate return thereof. This clause was insisted upon by William C. Peyton and Edward W. Freeman and it is admitted that the agreement would not have been executed without it.

It was further provided that the trustees should be kept advised as to the conduct of the business and consulted in all important matters affecting the firm's interests, with power in them to veto any business which they deemed highly speculative or injurious to the interests of the Peyton and Perkins owners. The trustees were given the right to attend any and all meetings of the members of the firm as well as the right of access at all times to its books and records. They were to receive monthly statements of assets and liabilities as well as statements of earnings from time to time; and were to receive any information which they deemed of importance in order to familiarize themselves with the condition of the business.

As a further guaranty for a return of the active securities, each member of the firm agreed to assign to the trustees all his interest in the partnership, including its name and good will, and until the return of all such securities, the members of the firm were not to draw any profits or compensation other than certain stated amounts. The trustees of the Peyton and Perkins groups were to be reimbursed for all costs and expenses incurred in investigating the firm, its assets and business, and for any and all costs or expenses they might incur for auditors, accountants, agents, attorneys and others in connection with carrying out the trust or protecting the active securities.

As compensation for the so-called loan, it was agreed that there should be a minimum payment of $100,000 and if there were profits, forty per cent of the profits up to $500,000. The first payment of such forty per cent was to be made on the 15th day of January, 1922, and thereafter semi-annually, payments were

to continue until all of the securities should have been returned to the owners or until $500,000 should have been received.

It was also provided that " In any event, whether any profits shall be made or not, the sum of One hundred thousand dollars ($100,000) shall be paid the owners of the active securities," but " only in the event that forty per cent (40%) of said profits shall fail to equal said amount," and that when all the active securities were returned, " the parties of the first part shall not be entitled to receive any further profits that may be made by said firm after said date."

If a difference should arise as to the amount of profits, the question was to be determined by John R. Hall and the trustees and, should they fail to agree, by an arbiter.

The monthly payments made to members of the firm were to be treated as expenses and deducted as such in computing the forty per cent of profits.

It was agreed that " The parties of the first part shall not be interested in ' profits ' as such. Their interest in profits shall be construed merely as a measure of compensation for loaning said active securities to said firm and granting permission to the firm to hypothecate the same, and for the services to be rendered by the Trustees. The parties of the first part shall not be responsible for any losses that may be made by said firm. The parties of the first part shall not in any way be deemed or treated or held as partners in said firm. No one of the parties of the first part shall be under any partnership liability or obligation. It is not the intention of any of the parties of the first part to assume any of the liabilities of said firm or any of the liabilities of the parties of the second part."

The intention of the parties must be gathered from the facts disclosed by the record. A partnership is a status and may exist by reason of the terms of an agreement, although the parties thereto incorporate therein a declaration to the contrary.

In *Adam* v. *Newbigging* (L. R. 13 App. Cas. 308, 316) Lord Chancellor HALSBURY said: " My Lords, I have thought it right to say so much upon the subject, because though content to decide this case without reference to the question of partnership, I am anxious that we should not be supposed to hold that these contracts did not constitute a partnership. The draftsman apparently looked at all the cases, beginning at *Waugh* v. *Carver* (2 H. Bl. 235; 1 Sm. L. C. 9th ed. p. 877), and ran through them all, including *Pooley* v. *Driver* (L. R. 5 Ch. D. 458), *Mollwo, March & Co.* v. *Court of Wards* (Law Rep. 4 P. C. 419), *Ex parte Delhasse* (L. R. 7 Ch. D. 511), and *Ex parte Tennant* (L. R. 6 Ch. D. 303), and cleverly strives to avoid the effect of each test discussed in these cases by something which

should have the same effect, but which should avoid the specific test. I wish to say every such expedient would be absolutely void in the view I take of the law."

In addition to the fact that John R. Hall was made dominant and responsible to the groups who turned over the securities, the firm was prohibited from making any highly speculative ventures or purchases without the written consent of the trustees or from participating in any speculative underwritings without like consent, until the return of the active securities. Furthermore, the members were not to buy or sell on margin directly or through their wives, and all of their margin accounts were to be closed.

An agreement, referred to as " the indenture," was executed as a guaranty for the performance by the " mortgagors," the avowed partners, of their covenant to return the active securities to the Peyton and Perkins owners. It contained an express transfer to the trustees of inactive securities as well as a recital that each such member of the firm had assigned his interest therein, its name, good will and profits, subject to the monthly allowances. It contained the customary provisions to make the pledge effective.

In one agreement it was provided that all of the members of the firm should sign resignations to be placed in the custody and control of John R. Hall. These resignations were called for, signed, received and kept in the custody of John R. Hall at all times until the bankruptcy proceedings.

Hall had no capital interest but he was to receive twenty-six per cent of the profits. Other members of the firm, all of whom had invested capital, were to receive a less percentage of the profits, with the exception of Oscar L. Gubelman, who had a capital interest of $145,783.40 and who was to receive but twenty-six per cent of the profits. Mary Whitman Knauth, who had a capital interest of $254,889.76, was to receive but six and one-half per cent of the profits.

With these facts before us, we must decide whether the persons included in the Peyton and Perkins groups have rendered themselves liable as partners to creditors.

In the Uniform Partnership Act, known in this State as the Partnership Law (Laws of 1919, chap. 408, § 10, subd. 1), a partnership is defined as an association of two or more persons to carry on as co-owners a business for profit.

Section 11, subdivision 4, of our Partnership Law of 1919 provides: " The receipt by a person of a share of the profits of a business is *prima facie* evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment: (a) As a debt by installments or otherwise, (b) As wages

of an employee or rent to a landlord, (c) As an annuity to a widow or representative of a deceased partner, (d) *As interest on a loan though the amount of payment vary with the profits of the business,* (e) As the consideration for the sale of the good-will of a business or other property by installments or otherwise." (See Uniform Partnership Act, § 6, subd. 1; Id. § 7, subd. 4.)

Under the statute the question is whether the payments to be received should be regarded as interest on a loan, though the amount was to vary with the profits of the business.

The appellant contends that this so-called loan of securities was in no way analogous to and in fact was in every essential different from any loan contemplated by the statute; that the Peyton and Perkins groups retained ownership of the active securities, and it is asserted that this is of the essence of partnership. It is also argued that the dominion of the Peyton and Perkins groups over the capital of Knauth, Nachod & Kuhne was not less, but greater than the dominion of a partner in the ordinary case.

That the first transaction with William C. Peyton was a loan, it is asserted by the defendants, respondents, is clearly demonstrated by subsequent proceedings. After the first loan it was found that a further loan would be necessary. Thereafter additional resources became necessary. A plan of reorganization was arranged, the active securities were returned to the lenders, the inactive securities were returned to the firm, and $3,000,000 in cash was loaned to take the place of the securities. Between November 15 and November 20, 1922, there were heavy withdrawals by depositors and there arose a need for immediate additional assistance. New agreements contemplating a reorganization were executed. Subsequently the avowed partners, stating that the reorganization plan would furnish a capital of only $600,000, took the position that it was necessary to have a capital of at least $1,000,000. After prolonged negotiations a tentative plan dated March 6, 1923, looking to a capital of $1,000,000, was worked out. It was later learned that at the time the avowed partners were approving the plan of reorganization first referred to and obtaining a loan of $3,000,000 from the lenders, together with their obligation to advance an additional loan of $1,000,000 if required, the firm had been engaged in an unsuccessful speculation resulting in a loss of $1,000,000. This and losses in other foreign exchange transactions prohibited by the agreement appear to have been known to John R. Hall, although they occurred in the foreign exchange department which was not in his direct charge. On June 15, 1923, following these reverses, an involuntary petition in bankruptcy was filed against the firm.

The creditors now seek to hold the respondents as partners. Sharing in profits does not of itself, under the Uniform Partnership Act, render one liable as a partner. In this respect the provisions of the Partnership Law are in keeping with the English decisions.

In *Mollwo, March & Co.* v. *Court of Wards* (1872) (L. R. 4 P. C. 419) the court said: " If cases should occur where any persons, under the guise of such an arrangement, are really trading as principals, and putting forward, as ostensible traders, others who are really their agents, they must not hope by such devices to escape liability; for the law, in cases of this kind, will look at the body and substance of the arrangements, and fasten responsibility on the parties according to their true and real character."

In *Harvey* v. *Childs & Potter* (28 Ohio St. 319) Judge DAY, writing the opinion, said: " The case of *Cox* v. *Hickman*, decided by the House of Lords in 1860, has become a leading case on the subject. (99 E. C. L. 47; 8 House of Lords Cases [Clark], 268.) It is summarized in the subsequent case of *Bullen* v. *Sharp*, 1 Law Reporter, 112,* by BLACKBURN, J., as follows: ' I think that the *ratio decidendi* is, that the proposition laid down in *Waugh* v. *Carver*,† viz., that a participation in the profits of a business does of itself, by operation of law, constitute a partnership, is not a correct statement of the law of England; but that the true question is, as stated by Lord CRANWORTH, *whether the trade is carried on on behalf of the person sought to be charged as a partner*, the participation in the profits being a most important element in determining that question, but not being in itself decisive; the test being, in the language of Lord WENSLEYDALE, whether it is such a participation of profits as to constitute the relation of principal and agent between the person taking the profits and those actually carrying on the business.' Add. on Cont. 163.

" These cases were decided before the passage of the act of Parliament in relation to partnerships. But, so far as relates to this question, in a subsequent case, BRAMWELL, J., declared, in effect, that the act was only declaratory of the common law, as held in *Cox* v. *Hickman*. *Holme* v. *Hammond*, 7 Law, 218–236.‡"

In *Eastman* v. *Clark* (53 N. H. 276) the court said that the real and ultimate question in all cases like the one there under consideration is one of agency; that whether the person sought to be charged stands in the relation of principal to the person contracting the debt, is a question of fact; and that upon the trial of that question, proof of a right to participate in the profits would be a cogent, and often practically conclusive, piece of evidence to

---

* See L. R. 1 C. P. 86, 112.— [REP.      † See 2 H. Bl. 235.— [REP.
‡ See L. R. 7 Exch. 218, 230.— [REP.

establish the existence of that relation; but that there is no sound foundation for an arbitrary rule of law requiring courts or juries to regard participation in the profits as a decisive test which will in all instances necessitate the conclusion that the participator is liable for the debts.

In *Badeley* ·v. *Consolidated Bank* (L. R. [1888] 38 Ch. D. 238) LINDLEY, L. J., said: " It is no longer right to infer either partnership or agency from the mere fact that one person shares the profits of another. It may be, and probably it is true, that if all that is known is that one person carries on a business and shares the profits of that business with another, *prima facie* those two are partners, or· *prima facie* the person carrying on the business is carrying it on as the agent of the person with whom he shares his profits. That may be true, and I think is true even now; but when you have a great deal more to consider it appears to me to be a fallacy to say that you are to proceed upon the idea that sharing profits *prima facie* creates a partnership or an agency, and that *prima facie* presumption has to be rebutted by something else. I cannot help thinking that Sir MONTAGUE SMITH was quite correct when he dealt with that mode of reasoning in the case of *Mollwo, March & Co.* v. *The Court of Wards* (Law Rep. 4 P. C. 433). He says this: ' It was contended at the Bar, that whatever may have been the intention a participation in the net profits of the business was, in contemplation of law, such cogent evidence of partnership that a presumption arose sufficient to establish, as regards third parties, that relation, unless rebutted by other circumstances. It appears to their Lordships that the rule of construction involved in this contention is too artificial; for it takes one term only of the contract and at once raises a presumption upon it. Whereas the whole scope of the agreement, and all its terms, ought to be looked at before any presumption of intention can properly be made at all.' Now it appears to me, having read the judgment of Mr. Justice STIRLING with great attention, that he has inadvertently fallen into that erroneous method of reasoning. He has laid stress on the fact that Smith and Badeley participated in profits and has treated that circumstance as *prima facie* evidence of partnership which had to be rebutted by other evidence, instead of taking the whole of the documents and the whole of the evidence and drawing such inferences as he thought right from the whole.

" Then certain letters were alluded to in which the expression ' capital ' was used, and there is a rather remarkable document, a receipt, on which Mr. Cozens-Hardy naturally relied, on the 26th of September, 1878, which was a receipt for £1,000 advanced on account of working capital. I quite agree that if you take

those documents alone they are consistent with either view. But they do not stand alone by any means, and when you do look at the whole of the evidence it appears to me that the formal document expresses the real truth, namely, that this was a contract of loan upon security. It was said that the capital was in the business, and risked in the business. It was in the business in a sense, that is to say, the money was advanced for the purpose of enabling Smith to carry on his contract with the railway company, and there was a stipulation that the money should be used for that purpose."

In *Meehan* v. *Valentine* (145 U. S. 611) Mr. Justice GRAY, writing the opinion of the court, held that one who lends a sum of money to a partnership under an agreement that he shall be paid interest thereon at all events, and shall also be paid one-tenth of the yearly profits of the partnership business if those profits exceed the sum lent, does not thereby become liable as a partner for the debts of the partnership.

In *Badeley* v. *Consolidated Bank* (*supra*) the court further said (p. 250), per COTTON, L. J.: "Undoubtedly, if one found that two persons were participating in the profits made by a business, and knew nothing more, one would say, How is this? If they participate in the profits as being jointly entitled to the profits, that unless explained would lead to the conclusion that the business is the joint business of the two, and this would be partnership. But then when the participation in profits arises from a clause in an agreement entered into between the parties, it is wrong to say that this is *prima facie* evidence of a partnership, because you must look not only to that stipulation, but to all the other stipulations in the contract, and determine whether on the stipulations of the contract taken as a whole you can come to the conclusion that there is a partnership — that there is a joint business carried on on behalf of the two — or whether the transaction is one of loan between debtor and creditor."

These respondents were not co-owners of the business and were not partners as to each other; and essential elements of a partnership are absent. The individuals in the Peyton group, previously unacquainted with those in the Perkins group, and all previously unknown to the avowed partners, with the exception of John R. Hall, evidently did not become co-owners of the business. Such an effect, moreover, did not follow from the assignments to the trustees as security. The transactions began with a simple loan of bonds; and the idea of a loan, rather than that those composing the Peyton and Perkins groups acquired an interest in the business for themselves, prevailed throughout. John R. Hall's representation of them, and the power to control which they obtained, were intended to secure the safe return of what they had loaned as well

as payment therefor. He was not their agent in the sense that he was overseeing the conduct of the business as in any part their business. In their behalf it was not being carried on.

Heeding the cautionary statements as to the law contained in the leading cases, and considering all the terms of the agreements as well as all the facts disclosed, we find that John R. Hall was merely a protective representative of lenders whose compensation for their loan was to be measured by the profits.

The judgment should, therefore, be affirmed, with costs.

DOWLING, P. J., FINCH, MCAVOY and O'MALLEY, JJ., concur.

Judgment affirmed, with costs.